400 A.2d 199

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Earnest DAVIS.**

Superior Court of Pennsylvania.

Argued Nov. 17, 1977.

Decided March 28, 1979.

Robert E. Colville, District Attorney, Pittsburgh, for Commonwealth, appellant.

Rodney W. Baxter, Pittsburgh, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

PRICE, Judge:

This appeal by the Commonwealth arises from the order of the court below suppressing two prospective in-court identifications of appellee.[1] For the reasons stated herein, we affirm in part and reverse in part.

Evidence adduced at the suppression hearing is as follows. At approximately 9:05 a. m. on November 23, 1976, three men entered the A&P Supermarket on Scranton Avenue in Wilkinsburg. One of the men held the head cashier, Rose Ference, at gunpoint and ordered her to open the cash register, whereupon he removed the available money. Concurrently, the second intruder compelled, again at gunpoint, the store manager, George Obusek, to open the safe, which was summarily emptied of cash. The third robber, later identified as appellee, eventually positioned himself at the rear of the store where he held the remainder of the customers and employees at gunpoint in a small room.

1. The order of the court below suppressed both an in-court and an on-the-scene identification of appellee. On appeal, however, the Commonwealth contests solely the propriety of the court's suppression of the former. Its right to appeal is predicated on the fact that the order would so handicap the presentation of the Commonwealth's case as to effect a termination of the prosecution. *Commonwealth v. Ray*, 448 Pa. 307, 292 A.2d 410 (1972); *Commonwealth v. Bosurgi*, 411 Pa. 56, 190 A.2d 304 (1963); *Commonwealth v. Deren*, 233 Pa.Super. 373, 337 A.2d 600 (1975).

After approximately ten to fifteen minutes, all three intruders fled the premises.

While the robbery was in progress, the Wilkinsburg Chief of Police monitored a call on the police radio reporting the incident, and he immediately proceeded to the A&P. Upon arriving at the scene, he observed two men run behind the store, enter a waiting car, and speed away. Subsequent to a chase in which Chief Hodgins' car absorbed gunfire from the occupants of the suspect vehicle, the latter was abandoned, and its occupants escaped on foot. A non-entry observation of the vehicle revealed a sum of money, a gun, and several other items positioned on the front seat, while a license check identified appellee as the car's owner. Pursuant to this information, two officers were dispatched to appellee's home, but prior to their reaching his residence, appellee telephoned the police and reported his car stolen.

At appellee's home, the officers requested that he accompany them to locate the allegedly stolen vehicle. Appellee consented to this, but following a brief stop at the police station, he was taken to the supermarket[2] where he was identified by both Ms. Ference and Mr. Obusek as one of the robbers and immediately placed under formal arrest. Mr. Obusek later repeated this identification at the preliminary hearing.

The Commonwealth does not dispute the lower court's three stage analysis of the initial identification: that is, appellee was effectively under arrest at the time he accompanied the officers from his home; such an arrest was not supported by probable cause; the illegal arrest fatally tainted the on-the-scene identification. Rather, it argues that the in-court identification had a basis independent of any prior illegality and was thus purged of any possible taint. Although the issue rests on fine factual distinctions delineated *infra*, we can accept the independent basis rationale of the Commonwealth only with respect to the identification testimony of Ms. Ference.

2. At the suppression hearing, the arresting officers candidly admitted that they had no intention of taking appellee to his automobile.

 Subsequent to an illegal arrest or a suggestive out-of-court identification, an in-court identification is admissible if, considering the totality of the circumstances, it is determined that the in-court identification had an independent origin sufficiently distinguishable from the impermissible pre-trial encounter so as to be purged of any taint of that initial illegality. *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Commonwealth v. Connolly*, 478 Pa. 117, 385 A.2d 1342 (1978); *Commonwealth v. Taylor*, 472 Pa. 1, 370 A.2d 1197 (1977); *Commonwealth v. Fowler*, 466 Pa. 198, 352 A.2d 17 (1976); *Commonwealth v. Ryan*, 253 Pa.Super. 92, 384 A.2d 1243 (1978). This is merely a particular application of the basic tenets propounded in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), in which the United States Supreme Court concluded:

> "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Id.* at 487–88, 83 S.Ct. at 417 (citation omitted).

Such an independent basis need not be established by the Commonwealth beyond a reasonable doubt, but only by the existence of clear and convincing evidence. *Commonwealth v. Connolly, supra; Commonwealth v. Cox*, 466 Pa. 582, 353 A.2d 844 (1976); *Commonwealth v. Diggs*, 260 Pa.Super. 349, 394 A.2d 586 (1978). The rationale behind such a rule was made explicit in *Commonwealth v. Garvin*, 448 Pa. 258, 293 A.2d 33 (1972): "No law abiding society could tolerate a presumption that but for the illegal arrest the suspect would never have been required to face his accusors. . . . [T]he only effect of the illegal arrest was to hasten the inevitable confrontation and not to influence its outcome." *Id.*, 448 Pa. at 264, 293 A.2d at 37.

■ In order to determine the existence of this independent basis, we have adopted certain criteria originally formulated by the federal courts. In *United States v. Wade, supra,* the Supreme Court determined that consideration should be given to

> "the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification." *Id.* at 241, 87 S.Ct. at 1940.

*See also Commonwealth v. Taylor, supra; Commonwealth v. Cox, supra; Commonwealth v. Hodge,* 246 Pa.Super. 71, 369 A.2d 815 (1977).

Obviously, application of these criteria requires a careful scrutiny of the circumstances surrounding the witness' observation and the initial identification. Instantly, the testimony of the two identifying witnesses will be reviewed in sequence.

Mr. Obusek testified that on the morning of the robbery he had entered the store from the lower part of the building when he was confronted by a masked gunman who demanded that he open the store safe. After complying, he was ushered down an isle, at the end of which stood the intruder later identified as appellee. The aisle was well lighted and Mr. Obusek kept his head erect at all times. The man at the end of the aisle made no attempt to conceal his features, and his facial traits became discernable to Mr. Obusek when he was three or four feet away. As the two passed at a distance of from one to two feet, their eyes did not meet, although Mr. Obusek obtained a full view of the intruder's face. Mr. Obusek, however, testified that as he was approaching the robber, he was staring at the gun in the latter's hand for fully two or three feet after his features came into focus. Consequently, his view of the intruder's face for the critical three or four feet was of short duration.

Specifically, the witness stated that he gave the man's face only "[a] glance. You look at a man, and you look away. I mean, you're not—*I'm not studying him.*" N.T. 91 (emphasis added). After they had passed, Mr. Obusek did not turn back for another view.

Despite the fleeting nature of the observation, Mr. Obusek was able to provide police at the A&P with a detailed description of the robber's clothing—brown leather coat, light shirt or sweater, dark trousers, gloves, brown tassel cap, no glasses—and a general description of his physical characteristics—black, mustache, 140–45 pounds, height in the vicinity of 5′6″–5′7″. Subsequently, when police brought appellee to the scene, Mr. Obusek was asked, "Is this the fellow that was involved in the robbery?[3] He then peered into the window of the police car for five to ten seconds. Appellee, unhandcuffed, was in the rear seat beside another officer. Failing to recognize appellee at that time, the witness requested that he alight from the car. After appellee complied, Mr. Obusek scrutinized him for one to two minutes, then positively identified him as one of the robbers. He later testified at the suppression hearing that his identification was based at least partially on the fact that appellee was attired in a manner similar to that of the

3. The officers involved testified that the query was, "We have a suspect out there. We'd like you to take a look at him." N.T. 57. This discrepancy is indicative of the confused and contradictory testimony elicited with respect to the events surrounding the on-the-scene identification. Two of the officers at the A & P testified that both Mr. Obusek and Ms. Ference walked out of the store together, and both identified appellee at approximately the same time while he was still seated in the police car. Chief Hodgins, in contrast, testified that first Mr. Obusek emerged from the store, identified appellee while standing outside of the car, and re-entered the store, prior to Ms. Ference coming out and repeating the identification procedure. Mr. Obusek, as further detailed above, stated that he exited the store without any other employees in his company, and identified appellee only after the latter stepped from the police car. Ms. Ference testified that she and Mr. Obusek emerged from the store separately, but could not recall the exact sequence of identification, only that she recognized appellee. The discrepancies are not of such a magnitude, however, as to alter our analysis of either the opportunity for observation or the suggestiveness of the presentation.

robber (appellee at the time of identification was not wearing a coat allegedly worn by the intruder).

Applying the *Wade* criteria, it is clear that the Commonwealth failed to sustain its burden of establishing an independent basis for an in-court identification. Mr. Obusek's view of the robber's face, while unobstructed and in a well lighted area, was by his own admission nothing more than a glance rather than a studied observation. Indeed, for the few feet in which the intruder's face could be examined, the witness was more concerned, understandably, with the gun being trained on him. In *Commonwealth v. Fowler, supra,* it was held that a witness' "momentary look" or "glance" at the defendant was insufficient to demonstrate an independent basis following an illegal identification. The observation here was similarly deficient.

While it is true that the description given immediately following the event corresponded with appellee's actual appearance, the description was so general as to vitiate any probative worth. *See Commonwealth v. Fowler, supra,* 466 Pa. at 214–15, 352 A.2d at 25 (black, dark suit, slender build, aged 19–21, deemed too general). Further, although it has previously been noted that a detailed description of an individual's clothing evidences a good opportunity for observation and militates in favor of finding an independent basis, *see, e. g., Commonwealth v. Cox, supra,* those cases also contained proof that the identifying witness secured an extended view of the suspect. Such is not the case here. Finally, even in the initial identification which closely followed the robbery, Mr. Obusek hesitated when confronted with appellee, and while the witness never failed not to identify appellee, nor mistakenly identify someone else, he never had the opportunity to err in either of these respects.

This analysis leads us to conclude that Mr. Obusek's in-court identification did not originate in his observations during the crime, but was implanted by the improper on-the-scene identification. Although not blatantly suggestive, we

cannot say that the taint supplied by the initial illegality was sufficiently obviated by prior, independent observation.[4]

Ms. Ference's testimony, however, provides a different perspective. She testified that she observed three individuals enter the store. The man later identified as appellee wore no disguise, wielded a gun, and asked her the whereabouts of the manager. The witness was able to observe him for a period of three to four minutes at a distance of perhaps ten feet during the robbery, noting that "I did kind of get a look at him, but he was kind of crouched." N.T. 103. Nevertheless, she "kind of tried to remember his features." N.T. 104. At the suppression hearing, the witness described those features as a height of 5'6" or 5'7", a weight of approximately 150 pounds, and a prominent mustache. She could recall no details of the individual's attire. When the police arrived on the scene with appellee, Ms. Ference immediately pronounced him the person she had viewed in the store, although she admitted being "pretty rattled up by then . . . ." N.T. 105.

In contrast to the testimony of Mr. Obusek, we find that Ms. Ference's testimony establishes an independent basis for an in-court identification. The witness observed the robber from close range, under excellent lighting conditions, for three to four minutes. The intruder's facial features were completely unobstructed. *Cf. Commonwealth v. Taylor, supra* (witness' view of robber obstructed by "mirror-type" sunglasses and a hat). While the lower court appeared to emphasize the shortness of the time involved, numerous cases have previously held a similar period of observation sufficient to establish an independent basis. *See United States ex rel. Hollman v. Rundle,* 329 F.Supp. 1052 (E.D.Pa. 1971) (robbery—observation time of five minutes); *Commonwealth v. Thomas,* 460 Pa. 442, 333 A.2d 856 (1975)

4. It is commonly recognized that once a witness has made an identification, it is doubtful that he will later vary his opinion even in the face of information that leaves his initial choice open to doubt. *See* Comment, Expert Testimony on Eyewitness Perception, 82 Dick.L. Rev. 465, 474 (1978). *See also* J. Marshall, Law and Psychology in Conflict (1966).

(robbery—three to six minutes); *Commonwealth v. Montgomery*, 246 Pa.Super. 371, 371 A.2d 885 (1977) (robbery—five minutes); *Commonwealth v. Sansbury*, 229 Pa.Super. 60, 323 A.2d 820 (1974) (robbery—five minutes); *Commonwealth v. Minifield*, 225 Pa.Super. 149, 310 A.2d 366 (1973) (sodomy, burglary—three to four minutes).

Although it is true that Ms. Ference could clearly verbalize her concept of appellee's facial features only by noting the prominent mustache, it is not unusual to recall conceptual unities rather than disjointed, particularized features.[5] She was prompt and unwavering in her identification at the scene and at the suppression hearing. The time was ample not only to observe the robber, but as she testified, to study him. While it is of course for the fact-finder to pass ultimately on the issue of any witness' credibility, we can conclude Ms. Ference had a basis for identification independent of the tainted on-the-scene identification.

We therefore affirm the suppression order as applied to the identification by the witness Obusek and reverse that portion of the order applying to the in-court identification of the witness Ference. The case is remanded for proceedings consistent with this opinion.

SPAETH, J., concurs in the result.

JACOBS and WATKINS, former President Judges, and HOFFMAN, J., did not participate in the consideration or decision of this case.

5. This thesis was well stated by the Court of Appeals for the District of Columbia Circuit:

"[R]ecognition of a person or face would seem to be as much the product of a subjective mental image as of articulable, consciously remembered characteristics. A man may see clearly in his 'mind's eye' a face or a figure which he is hard put to describe adequately in words. . . . And the conscious attempt to separate the ensemble impression into particular verbalized features, in order to preserve some recollection, may well distort the original accurate image so that it is the verbalized characteristics which are remembered and not the face or the man." *Russell v. United States*, 133 U.S.App.D.C. 77, 81, 408 F.2d 1280, 1284, *cert. denied*, 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245 (1969).